UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE, a not-for-profit organization,<br><br>                Plaintiff,<br><br>v.<br><br>MAGAR E. MAGAR, d/b/a SYRINGA MOBILE HOME PARK,<br><br>                Defendant. | Case No. 3:12-cv-00337-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

       This case is a citizen suit under the Clean Water Act (CWA). 33 U.S.C. § 1251 *et seq.* Plaintiff Idaho Conservation League (ICL) alleges that Defendant Magar E. Magar, doing business as the Syringa Mobile Home Park, has discharged, and is likely to continue discharging, pollutants into the South Fork Palouse River without the required permit. ICL requests declaratory and injunctive relief, as well as civil penalties.

       Before the Court is ICL's Motion for Summary Judgment (Dkt 35). Having reviewed the briefing and affidavits relevant to this motion (Dkts. 36, 37, 38, 39, 30, 31, 45, and 46), the Court finds that the facts and legal arguments are adequately presented therein and that the decisional process would not be significantly aided by oral argument.

Dist. Idaho Loc. Civ. R. 7.1. For reasons explained below, the Court will grant summary judgment in favor of ICL on the issue of Magar's liability under the CWA's citizen suit provision.

# FACTS[1]

The South Fork Palouse River is an interstate waterway with its headwaters on Moscow Mountain in Latah County, Idaho. The river flows from its forested headwaters, passes through agricultural fields, skirts the city of Moscow, Idaho, enters the State of Washington near the city of Pullman, and eventually confluences with the Palouse River near Colfax, Washington. According to regulations promulgated by the Idaho Department of Environmental Quality (IDEQ) and approved by the United States Environmental Protection Agency (EPA), the South Fork Palouse supports coldwater aquatic life, salmonid spawning, and secondary contact recreation (e.g., boating). IDAPA 58.01.02.120.01.

However, the South Fork Palouse does not meet water quality standards established by the IDEQ to safeguard these beneficial uses. In particular, the South Fork Palouse exceeds the IDEQ's standards for sediment, temperature, nutrients, and bacteria (e.g., *E. coli*). Because of these exceedances, the IDEQ in 2007 developed total maximum daily loads, or TMDLs, for these pollutants. Essentially, a TMDL is a cleanup plan, seeking to reduce or eliminate the pollutants entering an impaired waterway. The

---

[1] The following facts are undisputed or, when disputed, taken in the light most favorable to Magar, the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (recognizing the district court's obligation to construe the record in the light most favorable to the non-moving party on motion for summary judgment). These facts are contained in the pleadings, materials filed in support of ICL's motion for summary judgment (Dkts. 37 to 41), and Magar's various filings in this matter (Dkts. 23, 45, 48).

**MEMORANDUM DECISION AND ORDER - 2**

IDEQ's assessment of the South Fork Palouse notes that the Syringa Mobile Home Park is a source of *E. coli* bacteria due to intermittent discharges from its sewage treatment lagoons. Further, the assessment states that *E. coli* levels in the river downstream from the Syringa Mobile Home Park must be reduced by 41% to comply with Idaho's water quality standards and to support secondary contact recreation.

Magar owns and operates the Syringa Mobile Home Park in Moscow, Idaho. The mobile home park consists of 96 units. Raw sewage is piped from each unit to a series of three sewage treatment lagoons located northwest of, and approximately 160 feet uphill from, the South Fork Palouse River. Ordinarily, the lagoons operate as a self-contained, no-discharge system. But the lagoons at certain times overflow into the South Fork Palouse. During periods of heavy snowmelt, precipitation, and runoff from adjacent land—typically during the winter or spring—the lagoons fill beyond capacity.

When this happens, maintenance workers employed by Magar drain the excess wastewater from the lagoons. If the excess is not released, there is a risk that the earthen dike between the lagoons and the river will fail, potentially allowing the lagoons' contents to flood into the river. To mitigate this risk, the maintenance workers have in the past piped the excess wastewater from the lagoons into a catch basin, treated the wastewater to some extent with chlorine, and then piped the wastewater from the basin into the river. However, the maintenance workers also have observed excess wastewater flowing, untreated, from the southeast corner of the largest lagoon into a ditch that drains into the river. Although piping the wastewater into the catch basin lowers the water level

**MEMORANDUM DECISION AND ORDER - 3**

in the lagoons, it can take days before the wastewater stops overflowing from the largest lagoon into the ditch and river.

There is evidence in the record indicating the Syringa sewage lagoons have been periodically overflowing into the South Fork Palouse since the winter of 1979. More recently, maintenance workers at Syringa observed wastewater flowing from the lagoons into the South Fork Palouse in 2011 and 2012.

Starting on or about March 18, 2011, a former maintenance worker at Syringa witnessed wastewater overtopping the southeast corner of the largest lagoon. Tom Moore, an engineering supervisor for the IDEQ, also witnessed the overflow. Magar's staff advised him of the overflow and began draining the lagoons into the catch basin for treatment before releasing the wastewater to the river. On March 21, 2011, the wastewater was still overflowing from the largest lagoon but, according to Syringa's maintenance staff, had "slowed some." (Dkt. 38-14 at 1.) On the same day, Magar's staff told him he needed to obtain a National Pollutant Discharge Elimination System (NPDES) permit to discharge the lagoon water into the South Fork Palouse. Magar claims, without citing specific facts, there was no overflow from the lagoons in 2011. But, given the substantial evidence to the contrary presented by ICL, the Court finds there is no genuine dispute that the largest lagoon overflowed into the South Fork Palouse during March of 2011.

The largest sewage lagoon overflowed again during a rainstorm in April 2012. On May 1, 2012, Magar emailed an IDEQ employee, stating "[o]ur lagoon is currently overloaded. . . . We need to disinfect and discharge but don't have the permit to do so."

**MEMORANDUM DECISION AND ORDER - 4**

(Dkt. 38-17 at 1.) On June 5, 2012 the Manager of the EPA's NPDES compliance unit emailed Magar: "Should you choose to discharge you will be in violation of the Clean Water Act and this may subject you to penalties under the EPA's civil or criminal authority. I urge you to consider alternatives for disposal of your discharge." (Dkt. 38-20 at 1.) Magar admittedly discharged wastewater into the South Fork Palouse during May or June of 2012,[2] but it is unclear whether the discharge occurred before or after the warning from the EPA.

On May 3, 2012, Magar applied to the EPA for an NPDES permit. The EPA received sufficient information to consider the application "complete" in mid-August 2012. To date, the EPA has not acted on Magar's application. The Agency has designated that application as "Tier 3," the lowest level of priority for permits in the EPA region covering Idaho. (Dkt. 38-27 at 2-3.) It is unclear whether or when the EPA will issue a permit.[3]

---

[2] On February 22, 2013, ICL, acting under Rules 33 and 36, served Magar with a set of interrogatories and requests for admission. One request asked Magar to admit that "between May 1, 2012, and July 1, 2012, wastewater from the sewage treatment facility was discharged to the South Fork Palouse River through any valves, gates, pipes, or ditches associated with the treatment facility." (Dkt. 38-21 at 8.) Because Magar did not respond to this query within 30 days, he may be deemed (as noted in ICL's motion) to have admitted that wastewater was discharged from the sewage lagoons in May or June of 2012. *See* Fed. R. Civ. P. 36(a)(3); *see also* (Dkt. 38-15) (Magar's responses to ICL's first set of interrogatories and requests for admission dated May 7, 2013).

[3] ICL argues with some support that the EPA's regulations may forbid issuing an NPDES permit for Magar's discharges. *See* 40 C.F.R. § 122.4 (i) (prohibiting NPDES permits for a new source or new discharger "if the discharge . . . will cause or contribute to the violation of water quality standards.") As noted above, the South Fork Palouse violates Idaho's water quality standards for sediment, temperature, nutrients, and bacteria. Based on the water quality sample results in the record, it appears that water in the Syringa sewage lagoons contains elevated levels of some of these constituents.

**MEMORANDUM DECISION AND ORDER - 5**

In the meantime, the Syringa Mobile Home Park sewage lagoons may overflow and discharge to the South Fork Palouse whenever local precipitation and runoff is sufficiently intense. There is no evidence that the sewage lagoons have been modified to prevent future discharges under circumstances similar to those in the spring of 2011 or 2012. In fact, Magar admits—in a filing with the Court—that he has "no control over these conditions" and, in the future, "it may be necessary to discharge disinfected wastewater into the waters of the South Fork of the Palouse River." (Dkt. 23-1, ¶¶ 2-3.)

Although Magar characterizes water discharged from the catch basin as "disinfected," the record does not support this claim. Water samples collected from the catch basin on March 11, 2013, contained levels of *E. coli* bacteria several times greater than the TMDL for the South Fork Palouse. *Compare* (Dkt. 38-25 at 2) (catch basin *E. coli* level of 1,119.9 most probable number of colony forming units per 100 milliliters) *with* (Dkt. 38-6 at 15) (South Fork Palouse year-round *E. coli* TMDL of 126 colony forming units per 100 milliliters). Magar claims that treatment in the catch basin reduces the level of bacteria in the water discharged to the river, but there is no evidence that the treatment process removes all pollutants. To the contrary, Magar's NPDES permit application states that the treated catch basin effluent contains substances that result in biochemical oxygen demand, as well as fecal coliform bacteria and suspended solids. (Dkt. 38-26 at 4.) And, as discussed above, the wastewater discharged to South Fork Palouse is not necessarily treated in the catch basin—wastewater sometimes flows, untreated, to the river from the southeast corner of the largest sewage lagoon.

There is no dispute that Magar, acting through his employees, has discharged wastewater from the Syringa Mobile Home Park sewage lagoons into the South Fork Palouse River. While there is no record of discharges from Syringa after this lawsuit was filed, it is undisputed that, given sufficiently wet weather, there is a risk of similar discharges in the future.[4] In fact, Magar plans to continue discharging as necessary. According to Magar, "whenever there is a significant precipitation event, [Magar] will divert the water to the catch basin, take readings…, disinfect and release [the water into the South Fork Palouse River.]" (Dkt. 45 at 3.)

Magar admits that he did not in the past, and does not now, have an NPDES permit for the discharges.

## STANDARD OF REVIEW

Rule 56 directs the court to "grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Critically, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "A dispute

---

[4] On May 13, 2013, ICL served Magar with a second set of requests for admission under Rule 36. (Dkt. 38-24.) Among other things, ICL asked Magar to admit that (1) "there is a risk of the treatment lagoons overflowing or otherwise breaching their dikes," (2) "if the treatment lagoons overflow or breach their dikes, there is a risk of wastewater entering the South Fork Palouse River," and (3) "neither [Magar] nor [Magar's] employees have eliminated the risk of the wastewater overflowing or breaching the dikes surrounding the lagoons." (*Id.* at 11-12.) To date, Magar has not responded and is, therefore, deemed to have admitted these matters. *See* Fed. R. Civ. P. 36(a)(3).

**MEMORANDUM DECISION AND ORDER - 7**

about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir.2010) (quoting *Anderson*, 477 U.S. at 248).

"The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir.2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." *Id*. "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2).

## DISCUSSION

The CWA's central "objective" is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To that end, the CWA generally prohibits "the discharge of any pollutant by any person" unless an enumerated exception applies. *Id.* § 1311(a). The broadest of these exceptions, and the one relevant here, is the NPDES permit program. *See id.* § 1342.

The NPDES program authorizes the EPA or qualifying state agencies to issue permits for discharges that would otherwise be illegal under the Act.[5] *See EPA v.*

---

[5] Most states have earned the authority to issue NPDES permits for discharges within their borders, but the EPA administers the NPDES program in Idaho. *See generally* Idaho Dept. of Envtl. Quality, National Pollutant Discharge Elimination System Permits,

**MEMORANDUM DECISION AND ORDER - 8**

*California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 204-05 (1976) (explaining the purpose and scope of the NPDES program). "An NPDES permit serves to transform generally applicable effluent limitations and other standards including those based on water quality into the obligations (including a timetable for compliance) of the individual discharger. . . ." *Id.* at 205. In other words, the NPDES program seeks to improve water quality by controlling pollution discharged from discrete sources.

The CWA empowers private citizens to bring suit "against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation . . . ." *Id.* § 1365(a). A person violates an effluent standard or limitation by, among other things, committing "any unlawful act under [33 U.S.C. § 1311(a)]," including the discharge of a pollutant without an NPDES permit. *Id.* § 1365(f). However, "wholly past" violations are not actionable under the citizen suit provision. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987). Instead, the citizen plaintiff must "make a good faith allegation of continuous or intermittent violation." *Id*.

Aside from these substantive requirements, the CWA also requires citizen plaintiffs to give notice of the alleged violation to the EPA Administrator, the state in which the alleged violation occurs, and the alleged violator. 33 U.S.C. § 1365(b)(1)(A). If the EPA Administrator or the relevant state commences and diligently prosecutes a civil or criminal action against the alleged violator, a citizen suit is barred. *Id.* § 1365(b)(1)(B). "[T]he purpose of notice to the alleged violator is to give an opportunity to bring itself

---

http://www.deq.state.id.us/permitting/water-quality-permitting/npdes.aspx (last visited June 3, 2014).

**MEMORANDUM DECISION AND ORDER - 9**

into complete compliance with the [CWA] and thus . . . render unnecessary a citizen suit." *Gwaltney*, 484 U.S. at 60. Absent a governmental enforcement action and so long as the alleged violation is not wholly past, a citizen suit may commence 60 days after the citizen plaintiff gives notice of the alleged violation. *Id*. § 1365(b)(1)(A).

1. **ICL complied with the procedures for commencing a CWA citizen suit**

ICL commenced this action by filing a civil complaint against Magar on July 2, 2012. The complaint was filed more than 60 days after ICL, acting pursuant to 33 U.S.C. § 1365(b)(1)(A), gave notice of its intent to sue to the EPA Administrator, the Director of the IDEQ, and Magar. According to ICL, neither the EPA nor the IDEQ has commenced a civil or criminal action against Magar. Thus, it appears ICL has satisfied the CWA's procedural prerequisites for commencing a citizen suit. Magar does not argue otherwise.

2. **Magar is in violation of the CWA**

To prevail, ICL must prove an "ongoing violation" of the CWA. *Gwaltney*, 484 U.S. 66. Generally, it is a violation of the CWA to "discharge any pollutant" without a NPDES permit. 33 U.S.C. § 1311(a). The Act's definitional section illuminates this general prohibition.

Under the CWA, the phrase "discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The CWA expansively defines the word "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." *Id.* §

**MEMORANDUM DECISION AND ORDER - 10**

1362(6). A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . ., from which pollutants are or may be discharged." *Id.* § 1362(14). "Navigable water" means "waters of the United States," *Id.* § 1362(7), and the EPA has interpreted "waters of the United States" to include "all interstate waters." 40 C.F.R. § 122.2. Under these statutory definitions, it is a violation of the CWA to (1) add, (2) a pollutant, (3) from a point source, (4) to a water of the United States, (5) without a permit. *Comm.to Save Mokelumne River v. East Bay Mun. Utility Dist.*, 13 F.3d 305, 308 (9th Cir. 1993). Although there are exceptions to the NPDES permit requirement, Magar does not argue that any exception applies here.

It is undisputed that Magar has added both treated and untreated wastewater from the Syringa Mobile Home Park sewage lagoons to the South Fork Palouse. Treated or not, the effluent contain substances—such as sewage and biological materials—that easily fit the CWA's broad definition of "pollutant." The pipe from the catch basin to the South Fork Palouse is a point source by definition. In addition, the largest sewage lagoon is a point source when wastewater overflows from its southeast corner and reaches the river. *See, e.g.*, *Wash. Wilderness Coalition v. Hecla Mining Co.*, 870 F.Supp. 983, 988 (E.D. Wash. 1994) ("[T]he touchstone for finding a point source is the ability to identify a discrete facility from which pollutants have escaped."). As an interstate waterway, the South Fork Palouse River qualifies as a water of the United States. And Magar admits that he does not have an NPDES permit. Therefore, unpermitted discharges from *both* the catch basin and the largest lagoon are violations of the CWA.

**MEMORANDUM DECISION AND ORDER - 11**

Based on the undisputed facts, the Court finds Magar violated the CWA during the spring of 2011 and again in the spring of 2012. However, Magar, citing the United States Supreme Court's decision in *Gwaltney*, argues that ICL's citizen suit fails because these unpermitted discharges are "wholly past." 484 U.S. 49, 67 (1987). In *Gwaltney*, the Supreme Court held that a CWA citizen suit may not be premised on unlawful conduct that occurred entirely before filing of the lawsuit. *Id*. But the Court explained that the CWA "does not require that a defendant 'be in violation' of the Act at the commencement of the suit; rather, the statute requires that a defendant be '*alleged* to be in violation.'" *Id.* at 64. The Ninth Circuit has recognized this requirement allows a "citizen plaintiff [to] prove ongoing violations either (1) by proving violations that continue on or after the date the complaint is filed or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." *Sierra Club v. Union Oil Co. of Cal.*, 853 F.2d 667, 671 (9th Cir. 1988) (internal quotations omitted).

While there is no evidence of a discharge from the Syringa sewage lagoons after this lawsuit commenced in July of 2012, the record indicates that future violations are reasonably likely. Magar admits that the lagoons discharge to the South Fork Palouse "about once every four or five years." (Dkt. 36-8 at 6.) Furthermore, nothing in the record suggests Magar has remedied the root cause of the unlawful discharges—the lagoons' inadequate capacity during periods of heavy precipitation and runoff.

Instead, Magar contends he can predict future overflow events using climatological data and "will divert the water to the catch basin, take readings . . .,

**MEMORANDUM DECISION AND ORDER - 12**

disinfect and release [the water into the South Fork Palouse River.]" (Dkt. 45 at 3.) Some might applaud this plan as a practical solution to an infrequent problem, but the CWA is not so lenient. As noted above, the CWA generally prohibits the "discharge of any pollutant by any person" except in compliance with the Act's mandates. 33 U.S.C. § 1311. Without a permit, Magar essentially plans to continue violating the law. This plan ignores the gravamen of ICL's claim and is unsupported by a scintilla of evidence that the EPA will issue a permit for future discharges. Thus, Magar is in violation of the CWA because the record demonstrates continuing likelihood of unlawful discharges from the Syringa Mobile Home Park sewage lagoons into the South Fork Palouse River.

## CONCLUSION

Finding no genuine dispute as to any material fact, the Court concludes that Magar is liable under the CWA's citizen suit provision. Not only does Magar admit past illegal discharges from the Syringa sewage lagoons, he plans to continue illegally discharging if future weather conditions so require. These admissions are fatal to Magar's defense. Worse, they demonstrate that Magar continues to regard the already-impaired South Fork Palouse River as a sewer. ICL is entitled to summary judgment.

# ORDER

Based on the foregoing, the Court being otherwise fully advised in the premises,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment (Dkt. 35) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff shall file a brief, not to exceed 15 pages, on the appropriate remedy in this case on or before July 14, 2014. Defendant's response to Plaintiff's brief, also not to exceed 15 pages, shall be filed on or before August 4, 2014. Plaintiff shall not file a reply unless, upon a specific request, the Court so orders.

Dated: **June 05, 2014**

Honorable Candy W. Dale
United States Magistrate Judge