UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE, a not-for-profit organization, | Case No. 3:12-cv-00337-CWD |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER ON REMEDIES** |
| v. | |
| MAGAR E. MAGAR, d/b/a Syringa Mobile Home Park, | |
| Defendant. | |

Before the Court is the determination of the appropriate remedy for Defendant

Magar E. Magar's violations of the Clean Water Act (CWA). The Court previously

granted summary judgment in favor of Plaintiff Idaho Conservation League (ICL) on the

issue of Magar's liability under the CWA. In particular, the Court held that Magar, doing

business as the Syringa Mobile Home Park, violated 33 U.S.C. § 1311(a) by discharging

wastewater from Syringa's sewage treatment lagoons into the South Fork Palouse River

without the required permit. Having considered the parties' briefs on the appropriate

remedy, the record, and the oral arguments of counsel, the Court will enter an injunction and impose a civil penalty of $100,000, as explained below.[1]

## BACKGROUND

### 1. Procedural history

In early June of 2014, the Court entered summary judgment against Magar on issue of liability under the CWA. (Dkt. 51.) The Court also directed the parties to submit briefs on the issue of the appropriate remedy for Magar's CWA violations. In mid-July, ICL filed a brief and supporting factual materials, arguing for injunctive relief and a substantial civil penalty. Magar responded in mid-August, arguing for a nominal penalty but not contesting the issuance of an injunction. ICL's reply brief followed in early September.

Thereafter, the Court set the matter for oral argument on January 21, 2015. One week before oral argument, the Court authorized the parties to supplement the record with additional evidence. (Dkt. 70.) On January 16, 2015, ICL filed supplements to the record and a request for judicial notice. (Dkt. 72, 73, 74, 76.) Magar also filed a supplemental affidavit on January 16, describing, among other things, his efforts to obtain a permit for land application of the wastewater from the Syringa Mobile Home Park sewage lagoons. (Dkt. 75.) Following oral argument, the Court indicated it was inclined to issue an injunction and directed ICL to submit a proposed injunction by

---

[1] The parties consented in writing to have a Magistrate Judge conduct any and all proceedings in this case. (Dkt. 17); *see also* 28 U.S.C. § 636(c).

January 30, 2015. ICL did so, and Magar filed objections and comments to ICL's proposal on February 6. (Dkt. 78, 79.)

## 2.    Factual developments since summary judgment

The Court recited the undisputed facts of this case in its Memorandum Decision and Order dated June 5, 2014 (Dkt. 51 at 2–7). Those facts are well known to the parties and need not be repeated here. Instead, this background section will address key developments in this and the related state court litigation after the Court found Magar liable for violating the CWA.

This section references documents filed in two lawsuits against Magar in the District Court for the Second Judicial District of the State of Idaho, Latah County. Federal Rule of Evidence 201 authorizes the Court to take judicial notice of such documents, and ICL requests the Court to do so. Magar does not oppose ICL's request. Accordingly, the Court takes judicial notice of the documents attached to ICL's Supplement to the Record and Request for Judicial Notice (Dkt. 72-1 to 72-5). *See Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) (courts may take judicial notice of pleadings filed in related lawsuits).

This is not the only case where the Syringa Mobile Home Park's wastewater collection and treatment system has come under scrutiny. In January of 2014, the Idaho Department of Environmental Quality (IDEQ) filed suit in the District Court for the Second Judicial District of the State of Idaho in and for the County of Latah (the IDEQ

case).[2] The IDEQ alleged that Magar was liable for 16 counts of regulatory violations in connection with his operation of the public drinking water and wastewater systems at Syringa. (Dkt. 49-1.) The Honorable John Stegner entered judgment on the pleadings against Magar on June 11, 2014, enjoining Magar to, among other things, make repairs to the drinking water and wastewater systems, place the systems under the responsible charge of duly licensed personnel, and submit the results of various engineering studies to the IDEQ. (Dkt. 63-5.)

In February of 2014, a class comprised of Syringa residents filed suit against Magar in the Second Judicial District (the Residents case).[3] The Residents case settled after the parties reached an agreement as to liability and the terms of a permanent injunction. On August 7, 2014, Judge Stegner entered a Consent Judgment against Magar. Among other requirements, the Consent Judgment also enjoins Magar to repair the drinking water and wastewater systems and hire a duly licensed operator for the systems. (Dkt. 63-7.)

On November 4, 2014, Judge Stegner found Magar in contempt of court for failing to obey the injunctions in both the IDEQ and the Residents' cases. (Dkt. 72-1, 72-2.) About one month later, the IDEQ filed a second petition to commence contempt proceedings against Magar, alleging Magar's continuing failure to comply with Judge Stegner's June 11, 2014 Judgment. (Dkt. 72-3.) The minutes from the January 6, 2015

---

[2]    *Idaho Dept. of Envt'l Quality v. Magar*, 2d Jud. Dist. of Idaho, County of Latah, Case No. 2014-121.

[3]    *Page v. Magar*, 2d Jud. Dist. of Idaho, County of Latah, Case No. 2014-227.

hearing on the IDEQ's second contempt petition reflect that "the proof [was] sufficient beyond a reasonable doubt to find that Mr. Magar is in contempt." (Dkt. 72-5.) The records of both the IDEQ case and the Residents case belie Magar's claim that he "has complied with the orders in both cases, incurring great expense." (Dkt. 63 at 5.)

With respect to this case, Magar maintains he is "diligently working to bring [his] operations into compliance with the Clean Water Act." (Dkt. 63-6 at 2.) In particular, Magar has hired an engineer to investigate obtaining from the IDEQ a permit for land application of the Syringa wastewater onto an adjacent parcel owned by Magar (Magar Aff. ¶ 2, Dkt. 75.) The project is expected to take one year to complete. (*Id.* at 2.) Magar also notes he is still awaiting the United States Environmental Protection Agency's (EPA's) approval of his application for a National Pollutant Discharge Elimination System (NPDES) permit, which has been pending for three years. If granted, the NPDES permit may allow Magar to discharge from the Syringa wastewater lagoons into the South Fork Palouse River without violating the CWA. However, it is far from certain that the EPA will grant the permit. Aside from these measures, there is no evidence that Magar has acted to prevent further unpermitted wastewater discharges into the South Fork Palouse River.

Instead, Magar has directed his employees to pipe excess wastewater from Syringa's sewage lagoons into a catch basin for treatment "before release," presumably into the South Fork Palouse River. (Dkt. 63 at 2.) The Court previously found this is "essentially [a] plan[] to continue violating the law," because Magar lacks the permit necessary to legally discharge any amount of any pollutant into waters of the United

States. (Dkt. 51 at 13.) Nevertheless, Magar claims, but has not established, that his treatment process lowers the levels of biochemical oxygen demand (BOD)[4] and total suspended solids (TSS)[5] in the wastewater, such that it would comply with "limits set forth in a typical NPDES permit and the C.F.R. regulations." (Dkt. 63 at 2.)

## LEGAL STANDARDS

In a citizen suit such as this one, the CWA authorizes the Court to impose an appropriate civil penalty and to enforce the Act's prohibition against unpermitted pollutant discharges. 33 U.S.C. § 1365(a), (f). The CWA mandates the imposition of civil penalties for violations of the Act. The governing statute, 33 U.S.C. § 1319(d), is couched in mandatory language, and states that any person who violates the Act "*shall* be subject to a civil penalty not to exceed $25,000 per day." (emphasis added); *see also Natural Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 1001 (9th Cir. 2000) (holding that penalties are mandatory if a violation of the Act is found). The maximum daily penalty increased periodically after the statute was enacted and is currently set at $37,500.00. 40 C.F.R. § 19.4. Unlike damages in other civil cases, these penalties do not inure to the citizen plaintiffs, but are payable to the United States Treasury. *See Friends of the Earth v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 173 (2000).

---

[4]    "BOD is a measure of the oxygen requirement exerted by micro-organisms to stabilize organic matter. Waste water entering [a body of water] exerts an oxygen demand thereby depleting the amount of oxygen available for use by fish and plants. Without adequate oxygen, fish and plants die, eventually choking [the body of water]." *United States v. Metro. Dist. Comm'n*, 23 ERC 1350, 1353 n.4 (D. Mass. 1985).

[5]    "TSS . . . is an indication of the physical quality of the water. Very high levels of suspended solids can [a]ffect the ecology of [a body of water] by inhibiting light transmission needed for photosynthesis by which plants survive." *Metro. Dist. Comm'n*, 23 ERC at 1353 n.4.

In addition, the CWA authorizes the Court "to order that relief it considers necessary to secure prompt compliance with the Act. That relief can include, but is not limited to, an order of immediate cessation." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 320 (1982). Discretion is vested in the district court to either grant or deny a request for injunctive relief, depending upon its view of the range of public interests at issue. *Id.* If a district court chooses to grant an injunction, however, it must meet the requirements of Federal Rule of Civil Procedure 65(d), which states that every injunction must "a) state the reasons why it was issued, b) state its terms specifically, and c) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." F.R.C.P. 65(d); *see also*, *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1132 (9th Cir. 2006).

## DISCUSSION

### 1. Civil penalty

ICL asks the Court to impose $187,500 in civil penalties for Magar's violations of the CWA. Magar argues the Court should either impose a nominal penalty or reserve ruling on a civil penalty so that Magar can focus his financial resources on preventing future sewage lagoon overflows.

Congress has vested the courts with the authority to determine an appropriate civil penalty for violations of the CWA. *Tull v. United States*, 481 U.S. 412, 427 (1987). Like other civil penalties, the purpose of a penalty under the CWA is to provide restitution, punish the violator, and deter similar conduct by the violator and others. *Id.* at 422. Additionally, the CWA requires the Court to exercise its discretion in light of six factors.

In determining the amount of a civil penalty, the court shall consider [1] the seriousness of the violation or violations, [2] the economic benefit (if any) resulting from the violation, [3] any history of such violations, [4] any good faith efforts to comply with the applicable requirements, [5] the economic impact of the penalty on the violator, and [6] other such matters as justice may require.

33 U.S.C. § 1319(d). In considering the statutory factors, district courts generally employ either a "top-down" or a "bottom-up" approach. *Compare Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 573–74 (5th Cir. 1996) (top-down approach) *with United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 528–29 (4th Cir. 1999) (bottom-up approach). Here, the parties agree the Court should employ the top-down approach, which entails first calculating the maximum penalty and then, if appropriate, adjusting the penalty downward based on the six statutory factors. *Cedar Point*, 73 F.3d at 573.

## A. *Maximum penalty*

The CWA sets a maximum civil penalty of $37,500 per day for each violation. 33 U.S.C. § 1319(d); *see also* 40 C.F.R. § 19.4 (increasing statutory penalty to account for inflation). The record during the liability phase of this case established that Magar violated the CWA in the spring of 2011 and again in the spring of 2012.[6] (Dkt. 51 at 12.) Specifically, the Court found the March 2011 event lasted at least four days. (*Id.* at 4.) The duration of the 2012 violation is unclear from the record, but ICL does not argue it lasted for more than one day. (*See* Dkt. 52 at 12 n.19.)

---

[6]     In its reply brief on remedies, ICL contends that Magar has admitted to a sixth day of violation in May of 2013. However, the summary judgment record—which the parties developed in December of 2013 and January of 2014—does not mention this purported violation. Accordingly, the Court declines to find Magar liable for a violation that ICL did not establish at the time of summary judgment.

Thus, the Court has found Magar liable for two violations, which lasted a total of five days. Five days, multiplied by the maximum daily penalty of $37,500, yields a maximum civil penalty of $187,500.

## B.    *Analysis of the statutory factors*

Next, the Court considers whether to reduce the maximum civil penalty. Magar claims a nominal penalty is appropriate.  He contends the violations were sporadic and not serious, as the South Fork Palouse is heavily polluted and even dried up at times. Magar also claims he is making a good faith effort to comply with the CWA, citing his pending NPDES permit application and his purported compliance with 40 C.F.R. § 133.102 . Additionally, Magar contends a substantial penalty would frustrate his compliance efforts and possibly force him to abandon Syringa.

### (1)    *Seriousness and history of the violations*

With respect to the seriousness and history of Magar's violations, the Court starts with the premise that an impaired stream like the South Fork Palouse is no less worthy of the CWA's protection than the most pristine waters. Indeed, the central objective of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Consistent with this objective, Congress flatly prohibited "the discharge of any pollutant by any person" except as in compliance with the CWA. *Id.* § 1311(a). There is no dispute that Magar has repeatedly flouted this prohibition. It would therefore be antithetical to the CWA's purpose to credit the argument that a few sporadic discharges into an already-impaired stream warrant a

nominal penalty. *See PIRG v. Powell Duffryn Terminals, Inc.*, 720 F.Supp. 1158, 1167

(D.N.J. 1989), *rev'd in part on other grounds by* 913 F.2d 64 (3d Cir. 1990).

On the other hand, the nature and extent of the damage caused by Magar's

unpermitted discharges is difficult to ascertain. In its February 2007 "South Fork Palouse

River Watershed Assessment and TMDLs," the IDEQ notes that the river fails to meet

water quality standards, but the river's condition is not entirely attributable to Magar's

discharges. (Dkt. 53-2.) Further, some of Magar's violations are due to his discharge of

wastewater that was treated with chlorine, a practice that reduced (but did not eliminate)

the pollutants in the wastewater. And, Magar presents evidence—in the form of a

photograph taken on August 1, 2014 (Dkt. 63-4 at 3)—that the river may dry up at certain

times of certain years, rendering it unfit for secondary contact recreation.[7]

It is beyond dispute that Magar's repeated discharges of treated and untreated

wastewater and sewage to the South Fork Palouse River lowered the river's already-

degraded water quality. However, the discharges were sporadic—that is, they occurred at

times when local precipitation and runoff was sufficient to overwhelm Syringa's sewage

lagoons. Further, ICL presents no evidence of acute water quality problems attributable to

Magar's illegal discharges. In light of these competing considerations, the Court finds the

seriousness and history of Magar's violations neither compel nor preclude a reduction to

the maximum civil penalty. *Cf. ICL v. Atlanta Gold Corp.*, 879 F.Supp.2d 1148, 1168 (D.

---

[7]     In an effort to rebut this line of argument, ICL has filed photographs taken on August 19, 2014, showing some water in the South Fork Palouse in the reach downstream of the Syringa sewage lagoons. Regardless of the river's condition during the dog days of summer, it is undisputed that the river is not dry year-round.

Idaho 2012) (finding "quite serious" nearly three years of ongoing arsenic discharges at levels toxic to aquatic life).

### (2) *Economic benefit of noncomplaince*

ICL argues that Magar has obtained a substantial economic benefit from his illegal discharges. In support, ICL relies on a report on the economic benefits of Magar's noncompliance with the CWA prepared by Jonathan Shefftz on July 14, 2014.[8] (Dkt. 58-2.) Shefftz presents a range of potential economic benefit figures, reflecting various assumptions on the duration of Magar's noncompliance, as well as the nature and cost of measures necessary for Magar to achieve compliance. For example, Shefftz opines that the economic benefit to Magar of not making improvements necessary to achieve zero discharge from the Syringa sewage lagoons is between $7.6 million and $644,000, depending on the initial date of noncompliance. Based on the lower figure—which accounts only for the economic benefit of Magar's noncompliance since July 2, 2007[9]—it

---

[8]    Shefftz, a consulting economist retained by ICL, "specializes in the application of financial economics to litigation disputes, regulatory enforcement, and public policy decisions." (Shefftz CV, Dkt. 58-2 at 22–32.) In *Atlanta Gold*, this Court relied on a similar report prepared by Shefftz to determine the economic benefit of noncompliance with the CWA. 879 F.Supp.2d at 1167–68. As in that case, the Court finds Shefftz is qualified under F.R.E. 702 to testify about the economic benefit of noncompliance to Magar. Further, the Court finds Shefftz's report in this case highly credible because it employs an accepted methodology—known as the Weighted Average Cost of Capital or "WACC"—to determine the present value of Magar's noncompliance over a given period of time. *See, e.g., id.*; *United States v. Smithfield Foods, Inc.*, 972 F.Supp. 338, 348–49 (E.D. Va. 1997).

[9]    According to Shefftz's report, the July 2, 2007 date was selected "based upon the five year statute of limitations . . . cut-off from the date of the complaint filing in this case." (Dkt. 58-2 at 2.) Although the CWA does not contain a statute of limitations, it is well-established that the five-year limitations period of "28 U.S.C. § 2462 applies to [CWA] citizen enforcement actions" such as this. *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522 (9th Cir. 1987). Because ICL filed its Complaint on July 2, 2012, any illegal discharges from the Syringa sewage lagoons

is evident that Magar's economic benefit of noncompliance is substantially greater than the maximum civil penalty.

Magar does not dispute Shefftz's findings, arguing instead that "any such benefit is now negated by the fact that [Magar] is working to remedy the issues and avoid future overflows." (Dkt. 63 at 12.) This argument misconstrues the purpose of considering the economic benefit of noncompliance. "Every dollar not spent on bringing [Syringa's sewage lagoons] into compliance was a dollar [Magar] could spend elsewhere, presumably on activities that [he] deemed more critical to [his] ultimate goals." *Atlanta Gold*, 879 F.Supp.2d at 1167. Consequently, the fact that Magar now must pay to bring his facility into compliance with the CWA does not excuse his history of noncompliance. Accordingly, the Court finds the economic benefit Magar obtained from his unpermitted wastewater discharges does not support a reduction to the maximum penalty.

### (3)    *Good faith efforts at compliance*

Next, the Court considers Magar's efforts to comply with applicable requirements. This factor turns on "[w]hether [Magar] took any actions to decrease the number of violations or made efforts to mitigate the impact of [his] violations on the environment." *United States v. Smithfield Foods, Inc.*, 972 F.Supp. 338, 349–50 (E.D. Va. 1997). But, unlike *Smithfield* (a case involving violations of an existing NPDES permit), the applicable requirement here is the CWA's general prohibition against the "discharge of any pollutant by any person" without an NPDES permit. 33 U.S.C. § 1311(a).

---

before July 2, 2007 would not be actionable. Therefore, the Court finds it appropriate to only consider Magar's economic benefit of noncompliance since July of 2007.

At present, Magar is exploring options for preventing the lagoons from overflowing and, in the interim, attempting to treat any discharges that do occur. He has hired an engineer to investigate and, if feasible, obtain permits for land application of the lagoon wastewater. In the meantime, he plans to continue treating and then discharging any wastewater overflows pending approval of his NPDES permit application. Further, Magar claims to have mitigated the impact of his violations by meeting the requirements of 40 C.F.R. § 133.102, which sets "the minimum level of effluent quality attainable by secondary treatment" for BOD and suspended solids.

Missing from Magar's representations is any evidence of a concrete plan to stop the conduct that precipitated this lawsuit—discharging without a permit. Magar has hired an engineer, but he has not presented, let alone committed to, a plan of action based on the engineer's findings. His reliance on 40 C.F.R. § 133.102 is misplaced, as that regulation applies only to *permitted* discharges and, more importantly, sets only the "minimum" level of pollution control achievable through technology. *See Iowa League of Cities v. EPA*, 711 F.3d 844, 856 (8th Cir. 2013). Even if the EPA issued Magar an NPDES permit, the standards in § 133.102 would not necessarily apply to the Syringa discharges, because EPA may impose more stringent standards if it determines technology-based limitations will not achieve desired water quality levels. *Id*.

Thus, while Magar's efforts to obtain an NPDES permit and treat some of his discharges are notable, the weightier fact is that Magar has not demonstrated the unpermitted discharges are likely to stop any time soon. *See Smithfield*, 972 F.Supp. at 350 (giving "some credit" for "slow" steps toward a zero discharge treatment system but

finding interim compliance efforts "insufficient and inadequate"). Magar's purported efforts to comply with the CWA do not support a lower penalty.

### (4) *Economic impact on Magar and related matters*

Finally, the Court considers the economic impact that a penalty will have on Magar. In this context, the Court also considers Magar's argument that a substantial civil penalty could force him to abandon Syringa, potentially displacing the 90 low-income households currently residing in the mobile home park. Magar contends a substantial penalty would cripple his ability to comply with two injunctions already imposed by Judge Stegner in Latah County. As proof, Magar offers his Voluntary Petition for Chapter 11 Bankruptcy, filed on August 12, 2013, in the United States Bankruptcy Court for the District of Oregon, Case No. 13-35143-rld11 (Dkt. 63-8).[10]

As of the date of the petition, Magar had $11,914.36 deposited in various bank accounts and more than $5 million in assets. (Dkt. 63-8 at 4–6.) The petition reflects that Magar held more than $3 million in unencumbered assets. (*Id*. at 4–5.) Further, the petition states that Magar's combined average monthly income was $45,974.58. (*Id*. at 10.) Citing the balance of the bank accounts and a $700,000 mortgage on Syringa, Magar contends he lacks the ability to pay a substantial civil penalty.

"Where a violator cannot show that a penalty will have a ruinous effect, the economic impact factor under Section [1319](d) will not reduce the penalty." *United*

---

[10] The bankruptcy court dismissed Magar's case on August 21, 2013, due to Magar's failure to submit necessary documents. *In re Magar*, No. 13-35143-rld11, Dkt. 11 (Bankr. D. Or. Aug. 21, 2013). On August 26, 2013, the bankruptcy court denied Magar's motion to reopen the case, and there has been no further action in the case. *Id*. at Dkt. 13. As a result, the bankruptcy code's automatic stay is not in effect. *See* 11 U.S.C. § 362(c)(2).

*States v. Gulf Park Water Co.*, 14 F.Supp.2d 854, 868 (S.D. Miss. 1998); *see also Powell Duffryn*, 720 F.Supp. at 1166 (declining to reduce penalty because violator failed to show that a severe penalty would jeopardize its continued operation). Given evidence that Magar has substantial income and unencumbered assets, the Court is not persuaded that a substantial civil penalty would lead Magar to financial ruin. After all, the penalty would neither punish nor deter CWA violations if it could simply be absorbed as a cost of doing business. *See Atlanta Gold*, 879 F.Supp.2d at 1170; *Powell Duffryn*, 720 F.Supp. at 1166.

However, it is undisputed that Magar must make many costly improvements to Syringa to comply with court orders in this and other cases. It is also notable that Syringa provides low-income housing in an area where few alternatives exist. (Dkt. 63 at 1.) According to Magar, "[t]axing the park for money it does not have, and that will not go to the necessary repairs, would be catastrophic to the tenants." (Dkt. 75 at 3.) Because the penalty in this case is payable to the United States Treasury, Magar is correct that a penalty will do little to prevent future harm to the South Fork Palouse River or to keep Syringa in operation. Indeed, this Court has recognized that, "past a certain point, the public interest is better served by having the violator spend its money on efforts aimed at thorough, effective, and timely compliance." *Atlanta Gold*, 879 F.Supp.2d at 1170.

Therefore, it is appropriate to weigh the deterrent, punitive, and restitutionary purposes of a civil penalty against the pressing need to effectively and expeditiously address the root cause of Magar's CWA violations. On one hand, justice would not be served by displacing 90 households in an effort to make their landlord an example to would-be polluters. On the other hand, Magar has reaped a substantial economic benefit

from flagrantly violating one of the CWA's key provisions on multiple occasions. On balance, the Court finds the statutory factors support a substantial penalty in the amount of $100,000.

**2.      Injunctive relief**

ICL seeks a permanent injunction ordering Magar to (1) take interim steps to prevent the sewage lagoons from overflowing into the South Fork Palouse River, (2) prevent the dike surrounding the lagoons from breaching and releasing the contents of the lagoons into the South Fork Palouse River, and (3) commit to a plan of action that will eliminate the long-term risk of discharge to the South Fork Palouse River. Magar does not contest that an injunction should issue. However, he maintains that ICL's proposed injunction is overbroad and contains requirements that are not necessary to stop future discharges.

**A.      *Injunctive relief is appropriate***

To demonstrate that an injunction should issue, the plaintiff must establish the following: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010).

With respect to the first two elements, it is undisputed that the discharges from Syringa's sewage lagoons have lowered the water quality of the South Fork Palouse

River, exacerbating the river's already-polluted condition. There also is a continuing and material risk that the dike between the Syringa lagoons and the South Fork Palouse River will fail, potentially resulting in a flood of raw sewage into the river. (Sholander Depo. 13:8–25, 23:18–21, Dkt. 38-12.) In addition, ICL's members have been injured insofar as the river's polluted condition deters them from fishing in it. (*See* Smith Dec. ¶¶ 12–17, Dkt. 40; Oppenheimer Dec. ¶¶ 12–14, Dkt. 41.) "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often of permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).

 "If environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 (9th Cir.2004) (citing *Amoco*, 480 U.S. at 545). Although Magar contends it will be a financial hardship to meet his obligations under the CWA, the Court is unpersuaded on this point, as discussed above with respect to Magar's ability to pay a civil penalty.

Last, it is clearly in the public interest to prevent further degradation of the South Fork Palouse River. Indeed, "the public interest requires strict enforcement of the [CWA] to effectuate its purpose of protecting sensitive aquatic environments." *United States v. Akers*, 785 F.2d 814, 823 (9th Cir. 1986). Magar does not argue otherwise. Accordingly, ICL has demonstrated the equities of this case weigh decisively in favor of an injunction.

## B.     *Scope of the injunction*

The Court's "equitable powers under the CWA are limited to enforcing standards, limitations, and orders that have been violated." *Sw. Marine*, 236 F.3d at 1000 (citing 33 U.S.C. § 1365(a)). Consequently, the Court lacks the power to impose "equitable measures that are wholly unrelated to a violation of an existing standard, limitation, or order." *Id*. This case centers on Magar's violation of 33 U.S.C. § 1311(a), which prohibits the "discharge of any pollutant by any person" except as in compliance with the CWA.

At the Court's request, ICL submitted to the Court a proposed injunction consisting of 36 detailed requirements for future operation of the Syringa wastewater lagoons. (Dkt. 79.) Having considered ICL's proposal and Magar's objections, the Court finds it necessary that Magar take immediate action to prevent illegal discharges in the short-term. It is also necessary for Magar to commit to a long-term plan for eliminating the risk of all illegal discharges from the sewage lagoons—including discharges due to precipitation-induced overflow, intentional releases from the catch basin, or a breach of the dikes surrounding the lagoons. However, the Court declines ICL's proposal to retain jurisdiction over the case for the purpose of ordering Magar to implement a particular long-term solution.

As Judge Williams aptly observed while crafting the injunctive remedy in *Atlanta Gold*:

> [F]ederal courts are generalists with no special expertise in . . . hydrology, or the efficacy of various water treatment systems. This Court is not in a position to determine for the parties what the best solution to resolve the contamination . . . might be. An injunction of the type suggested by Plaintiffs—i.e. one that clearly places the burden on [the defendant] to

comply by a date certain, but that leaves the method of compliance up to the [defendant] and the permitting authorities . . .—is therefore the most appropriate.

879 F.Supp.2d at 1164. Here too, the technical details of how Magar can or should achieve compliance with the CWA are best left to Magar and the agencies charged with regulating wastewater systems or water quality.

Accordingly, Magar will be enjoined from discharging any pollutant from the Syringa Mobile Home Park sewage lagoons or catch basin into the South Fork of the Palouse River, except as expressly permitted by the EPA. Additionally, the Court finds further specific requirements necessary to guide Magar toward both short- and long-term compliance with the CWA. These requirements are summarized below and will be detailed in a separate judgment issued concurrently with this memorandum decision and order.

First, Magar will be required to place the Syringa wastewater system under the "responsible charge"[11] of duly licensed personnel, pursuant to Idaho's Wastewater Rules, IDAPA 58.01.16 *et seq*. Second, the personnel in responsible charge of the system will be obligated to prepare and implement a written plan for ensuring that the sewage lagoons do not overflow.[12] Third, if the person in responsible charge determines there is an

---

[11]    Consistent with Idaho's Wastewater Rules, "responsible charge" means "active, daily on-site or on-call responsibility for the performance of operations or active, on-going, on-site or on-call direction of employees and assistants." IDAPA 58.01.16.010.69.

[12]    In addition, the person in responsible charge, or personnel under such person's direct supervision, will be required to measure the freeboard in each lagoon on a daily basis from March 1 through July 1 of each year until Magar fully either implements a long-term plan to eliminate all discharges or decommissions the wastewater system. This daily measurement

unavoidable risk of imminent discharge to the South Fork Palouse River, Magar must immediately notify the IDEQ and the EPA and comply with any and all instructions from these agencies. Fourth, Magar will be directed to obtain and implement a written plan for eliminating any and all unlawful discharges from the Syringa sewage lagoons. Fifth, if Magar chooses to close the Syringa Mobile Home Park at any time before fully implementing the discharge elimination plan, Magar will be required to decommission the wastewater system in accordance with Idaho's Wastewater Rules.

## CONCLUSION

Based on the foregoing and being otherwise fully advised in the premises, the Court finds both a substantial civil penalty and an injunction are necessary to remedy Magar's violations of the CWA.

///

///

///

///

///

///

///

///

///

---

period encompasses the dates of past discharges to the South Fork Palouse River, as discussed in the Court's Memorandum Decision and Order on summary judgment. (Dkt. 51 at 4–5.)

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED** that:

1) Plaintiff Idaho Conservation League's Request for Judicial Notice (Dkt. 72) is **GRANTED**;

2) Defendant Magar E. Magar shall pay a civil penalty of $100,000.00 to the United States Treasury by March 1, 2015; and

3) An injunction consistent with this decision shall issue as part of a separate judgment.

Dated: **February 13, 2015**

Honorable Candy W. Dale
United States Magistrate Judge